MacDowell-Peterman Company, Inc., Appellant, *v.* Independent Packing Company, Respondent.

First Department, February 20, 1925.

Brokers — commercial brokers — action for commissions on sale of pork for defendant — contract provided for payment of commissions " when goods are shipped "— purchaser defaulted and goods were never shipped — contract is not ambiguous and construction is for court — storage of pork in seller's name for buyer's convenience not delivery or shipment — custom proved without contradiction that commissions not earned until shipment and acceptance — plaintiff is not entitled to commissions on entire sale — plaintiff is not entitled to commissions on money paid by buyer to seller to have goods held.

A contract between a broker and a seller for the sale of goods to a third person which contains a clause for payment of brokerage commissions " when goods are shipped " is clear and unambiguous and its construction is for the court and not for the jury.

In this action by a broker to recover commissions from the seller on the sale of pork to a third person, the broker is not entitled to recover commissions on the sale, since the contract, as stated, provided that commissions were not due until the goods were shipped, and since it appears that the purchaser defaulted in taking the goods as agreed by him and no goods were shipped, with the exception of a small amount thereof on which commissions were tendered, and for the further reason that a custom of the trade to the effect that a broker does not earn his commissions until the goods are shipped and accepted by the purchaser was proved by the uncontradicted testimony of disinterested dealers and provision brokers.

The fact that the seller in an endeavor to complete the sale and for the convenience of the buyer stored the goods in the seller's name awaiting the time when the buyer might be able to take the goods, did not constitute a delivery or shipment within the terms of the contract so as to give the broker the right to commissions.

The rule that in the absence of any stipulation to the contrary a broker earns his commissions upon the making of a binding contract of sale cannot apply in this case, since the contract in question here expressly provides that commissions are only to be credited upon the shipment of the goods.

The broker is not entitled to any commission on the amount paid by the buyer as margin in order to protect the seller while holding the goods against a declining market.

APPEAL by the plaintiff, MacDowell-Peterman Company, Inc., from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 29th day of November, 1922, upon the verdict of a jury rendered by direction of the court, and also from an order entered in said clerk's office on the 27th day of November, 1922, denying plaintiff's motion for a new trial made upon the minutes.

*Ehlermann, Smyth & Abbott [George W. Smyth* of counsel], for the appellant.

*Rounds, Schurman & Dwight [Ralph S. Harris* of counsel; *Edwin Hedrick* and *Cyrus B. Austin, Jr.,* with him on the brief], for the respondent.

MERRELL, J.:

The plaintiff is a domestic corporation engaged as commission merchants or brokers, and the defendant is a foreign corporation organized under the laws of the State of Maine and authorized to do business in the State of New York. The action was brought by the plaintiff to recover the sum of $4,893.75, which demand was afterwards increased by the consent of the defendant to $5,017.17, as and for commissions claimed to have been earned by the plaintiff in negotiating a sale by the defendant to one George Mogensen of 3,000 boxes of dried salt pork middles. At the trial the presiding justice directed a verdict for the defendant and judgment was entered thereon, from which the plaintiff has appealed, the plaintiff also appealing from the order denying plaintiff's motion to set aside the directed verdict.

The plaintiff alleges in its complaint that at the special instance and request of the defendant the plaintiff rendered services in procuring the sale of 3,000 boxes of pork, known as dry short salt clear middles, that being the trade name for the portion of the hog sold and embraced in the contract.

The answer puts in issue the material allegations of the complaint and alleges that the plaintiff as a broker made a contract on account of the defendant with said Mogensen for the sale of said pork, and that as one of the conditions of the sale and in conformity with the usage and custom theretofore prevailing with

the parties, it was agreed that the defendant would pay to the plaintiff a commission of one per cent of the selling price minus freight, such commission to become due and owing when the goods should be shipped; but that said goods, with the exception of a small part thereof, were never shipped, and that, therefore, the plaintiff earned no commissions under the terms of said contract, save for about two carloads of the pork embraced in the contract which was actually shipped and for which the defendant made a proper tender to the plaintiff of its commissions thereon, amounting to $163.62, said sum being deposited by the defendant with the city chamberlain as an offer of judgment herein.

It was the contention of the plaintiff upon the trial and still is upon this appeal that the one per cent commission was due the plaintiff upon the selling price of the pork when the contract of sale was actually entered into between the defendant and the purchaser, Mogensen. The defendant, on the other hand, contended at the trial and still contends that the plaintiff was only entitled to its commission when the goods embraced in the contract were actually shipped. Upon the trial the defendant also, under the allegations of its amended answer, gave a large amount of evidence, which was uncontradicted by the plaintiff, showing that the general and universal custom of the trade was that such brokerage commissions were not earned until the goods were shipped and accepted. In answer to such claim of the defendant the plaintiff took the position upon the trial and insists upon this appeal that while there was no actual delivery or shipment of the goods embraced in the contract, there was a constructive delivery to Mogensen of said goods in Chicago, which was equivalent to the shipment provided for in the contract. The defendant took exception to transactions entered into after the making of the contract of sale, but the court permitted proof to be offered by the plaintiff thereon. The defendant, nevertheless, contends that the facts proven show neither shipment nor a constructive delivery of the merchandise to Mogensen, the purchaser; that while the goods, as disclosed by the evidence, were stored in Chicago after Mogensen had made default in taking the goods in accordance with the contract of sale to him, they were thus stored at the request of the plaintiff in an effort to insure ultimate acceptance and completion of the contract by Mogensen, and that said goods were not stored in the name of Mogensen, but in the name of the defendant.

The contract for the sale of the pork was effected through a letter addressed to the defendant by the plaintiff on May 31, 1919, and confirmed by defendant's reply thereto of June 2, 1919. The plaintiff's letter to the defendant was as follows:

"*May* 31, 1919.

" The Independent Packing Co.,

" Produce Exchange Bldg.,

" N. Y. City:

" Gentlemen.— We confirm sale made for your account to George Mogensen, as follows:

" 1500 — 500# net boxes strictly Dry Salt Clear Middles 8/10 pieces at 32½¢ net per lb. to buyer.

" 1500 — 500# net boxes strictly Dry Salt Clear Middles 10/12 pieces at 32¾¢ net per lb. to buyer.

" The above f. a. s., provided buyer furnishes G. O. C. permit, and the goods to be shipped from Chicago last half July.

" Kindly arrange to credit our account with the usual 1% brokerage *when goods are shipped.*

" Yours very truly,

" MacDOWELL-PETERMAN CO., INC.,

" A. Peterman."

(Italics are the writer's.)

Defendant replied to this letter on June 2, 1919, as follows:

" The Independent Packing Co.,

" 41st and Halsted Streets

" Chicago, Ill.

---

" D-24 Produce Exchange Building,

" New York City.

" *June 2nd,* 1919.

" MacDowell-Peterman & Co., Inc.,

" 15 William Street,

" New York City, N. Y.:

" Gentlemen.— We hereby confirm sale made through you for the account of Geo. Mogensen — 50 Broad St.— said sale subject to your 1% brokerage.

" 1500 boxes 8/10 D. S. S. C. Middles 32½¢

" 1500 boxes 10/12 D. S. S. C. Middles 32¾¢

" Shipment from Chicago second half July.

" Thanking you for the favor, we remain,

" Yours respy.

" THE IND. PKG. CO.

" H. J. Finn."

These letters constitute the only contract for the sale of the goods in question. Clearly by the letter of the plaintiff to the defendant the condition upon which plaintiff's brokerage fees were to be paid was fixed, and without any ambiguity it is provided

that the one per cent brokerage was to be paid " when goods are shipped." There is nothing uncertain or ambiguous about this provision in the contract. Defendant's letter in reply was written by defendant's agent, Finn. Defendant undoubtedly, in confirming the sale mentioned in plaintiff's letter of May thirty-first, understood and had in mind that the brokerage was to be paid when the goods were shipped. The defendant proved, and such proof was uncontradicted by the plaintiff, that under the usage and custom which had prevailed between the parties in previous transactions, payments of commissions were made after goods were shipped and accepted. A large amount of expert testimony was offered and received on the part of the defendant that the universal usage and custom of the trade was that such commissions were payable only after shipment and delivery of the goods and acceptance by the purchaser. This testimony came from several disinterested dealers and provision brokers in the city of New York, some of them of forty years' experience in the sale of meats and other commodities. All of them testified that commissions were never earned by a broker until the goods sold were shipped and accepted by the purchaser.

The goods in suit were intended for export and were to be delivered f. a. s. New York. The goods were to be shipped from Chicago the last half of July. The foreign purchaser of the goods, to whom Mogensen had sold the pork, defaulted, and it appeared from the evidence that within the period when the shipment was to be made Mogensen learned that he could not dispose of the goods which he had agreed to purchase from the defendant. On June 30, 1919, and before the time when the goods were to be shipped from Chicago, Peterman, president and treasurer of the plaintiff, called upon the defendant's agent, Finn, at the defendant's office in New York city, with reference to postponing for a time the shipment of the pork from Chicago. Peterman gave as a reason that Mogensen's foreign buyer, to whom he had resold the pork, had fallen down on his contract. Peterman then suggested that the pork be stored and asked the defendant what it would do about it. Peterman asked the defendant to write a letter to his, Peterman's, concern in Chicago (plaintiff herein), assuring plaintiff that the merchandise would be stored in Chicago. Peterman stated that he wanted such a letter to show to his principal, Mogensen. Finn then suggested that Peterman dictate a letter, writing down just about what he wanted the defendant to say to Peterman's concern. Thereupon Peterman dictated a letter purporting to come from the defendant's New York office to the plaintiff in

which it was stated that the Chicago office was being requested to do everything possible to help Mogensen in the matter of securing storage for the pork. In view of the subsequent contention of the appellant that there was a modification of the contract, and that the old contract was virtually abrogated and as showing that neither the plaintiff nor the defendant understood that the sale of the pork to Mogensen had fallen through, but was ultimately to be carried out, the letter dictated by Peterman from defendant to plaintiff contained the following significant passage:

" Inasmuch as these goods were sold on f. a. s. basis, providing buyer can furnish G. O. C., *Chicago will arrange for the shipment whenever these goods are ordered to come forward,* and any extra incidental expense will be charged to Mogensen & Co." (Italics are the writer's.)

About July third the defendant advised Mogensen that it could arrange to store the pork in Chicago warehouses at certain rates per box per month, and on July seventh Mogensen notified defendant of his acquiescence in such arrangement. The defendant thereupon began to move the pork from its plant to the warehouses and warehouse receipts were taken in the name of the defendant and always stayed in defendant's name. Peterman requested that some of the warehouse receipts should be attached to drafts and sent to Mogensen for payment. This was done but payment thereof was refused. On July 30, 1919, one Dottenheim, an executive in Mogensen's firm, went to Chicago and there saw the president of the defendant and suggested to defendant's president that the contract be canceled, which suggestion was refused. Dottenheim then represented that Mogensen was then in no position to take the pork, and requested the defendant to carry the merchandise for the purchaser, and that it was finally agreed that defendant should carry the merchandise for a time, providing the purchaser put up a margin of fifteen per cent. Thus it appeared that Mogensen was unable to perform his contract, and the defendant could have at that time declared a default and sued for damages; but it clearly appears by the evidence that the defendant sought in every way to aid the buyer and to insure the ultimate performance of the contract and acceptance of the pork embraced therein. As an inducement to the defendant to refrain from declaring the contract forfeited and suing for damages thereon Mogensen paid by way of margin to the defendant $25,000 in cash and gave the defendant a note for $48,500, payable in sixty days. This was said to be " a margin against a declining market." Dottenheim admitted that Mogensen could not borrow the money necessary to pay for the pork. Defendant's president declined

Mogensen's offer of a note for the balance of the purchase price, but agreed to carry the pork as long as Mogensen should keep the margin good, and it was agreed that the parties should get together sixty days later and adjust what additional margin, if any, would be required. It was further agreed that the remainder of the pork should be placed in cold storage, and that defendant should carry the entire 3,000 boxes until November 1, 1919, Mogensen in the meantime to pay the storage charges and interest monthly. The market for the pork continued to decline and about August 16, 1919, an additional margin was demanded by the defendant of Mogensen. On September ninth Dottenheim again went to Chicago and conferred with Brennan, defendant's president. The latter asked Dottenheim why he did not borrow some money, and offered to loan him warehouse receipts covering the same pork which he could pledge as collateral to obtain such accommodation. Such a loan was arranged with a Chicago bank, Dottenheim signing a collateral note on behalf of Mogensen for $92,000 and paying the proceeds over to Brennan. Thereupon Brennan loaned Mogensen warehouse receipts covering 850 boxes of the pork already in storage, under the express agreement that the same should be pledged with the bank as collateral on said note. Dottenheim never had possession of these warehouse receipts, but the same were indorsed directly by the defendant and delivered to the bank with the note. Dottenheim at the same time signed a trust receipt on behalf of Mogensen reciting that the receipts for the 850 boxes were received in trust for the special purpose of being pledged as collateral to the note and provided that said receipts were to be returned to the defendant upon payment of the loan and in case said receipts should be sold under the provisions of the note, any surplus derived from such sale, after payment of the amount of the note and the expenses of the sale, was to be turned over to the defendant. The balance of the pork, being 2,150 boxes of middles, remained in defendant's cellars until September 11, 1919, when the defendant commenced to move the same to a cold storage warehouse. Such removal was completed on September 29, 1919, and warehouse receipts were issued to and in the name of the defendant, and which were thereafter held by the defendant and never delivered to any one nor indorsed until the meat was finally sold after Mogensen had gone into bankruptcy, such sale being made by the defendant with the consent of the trustee. Dottenheim again went to Chicago in September, 1919, in response to the insistence of defendant's president that payment for the merchandise should then be made. Dottenheim expressed a desire to protect the defendant in view of its fair treatment of Mogensen, and in

renewal of the sixty-day note for $48,500 gave him a demand note for a similar amount.  On November 21, 1919, Mogensen asked that two carloads of middles be shipped, requesting that a sight draft be drawn therefor upon him.  These two cars were taken from cold storage and shipped according to the buyer's instructions.  A sight draft in the sum of $16,676.11 was drawn upon and paid by Mogensen on account of the purchase price of said middles.  After deducting the freight charges thereon, a check for one per cent of the balance, or $163.62, was mailed to the plaintiff by the defendant. After the petition in bankruptcy against Mogensen had been filed, the $92,000 note given by Mogensen (then reduced by Mogensen's payment to $65,000) became due and the bank, on default of payment, on April 27, 1920, sold the 850 boxes of middles which had been pledged as collateral for the loan, and after satisfying the indebtedness due it, the bank paid the surplus from the sale, $2,068.33, to the defendant.  Defendant offered to deliver the remaining middles then in cold storage upon payment by Mogensen's trustee in bankruptcy of the balance of the purchase price.  This offer was refused by the trustee in bankruptcy, and the defendant proceeded, at the request of said trustee, to sell the middles at private sale and realized from said resale $157,695.22, showing a net loss to the defendant upon the contract of $201,061.82.

Upon the appeal the plaintiff, appellant, contends that the construction of the contract was for the jury; that the burden of proving the existence of the custom pleaded by the defendant was upon the defendant, and that whether the defendant sustained that burden and whether the requirements of such custom as existed were satisfied in the case was for the jury to determine under the evidence; that it was for the jury to determine the meaning to be attached to the letter of the plaintiff to the defendant stating the terms under which commissions were to be due the plaintiff.  It seems to me that the construction of the contract in suit was clearly for the court, and not for the jury.  This contract, as originally made, consisted of the two letters, the one from the plaintiff to the defendant of May 31, 1919, and the confirmation thereof by the defendant to the plaintiff by the defendant's letter of June 2, 1919.  In the plaintiff's letter the defendant is directed to " kindly arrange to credit our account with the usual 1% brokerage when goods are shipped."  I am unable to see anything ambiguous in this language or to understand how it can be said that the contract was for construction otherwise than by the court. It has been uniformly held that such a clause, unambiguous in its terms, was for the court to construe.  (*Sweezy* v. *O'Rourke*, 226 N. Y. 378; *Strauss* v. *Ernstein*, 232 id. 187.)

It is very clear that the shipment of the merchandise was a condition precedent to the earning of brokerage commissions by the plaintiff. Not only that, but the evidence offered by the defendant clearly showed without contradiction that such a construction was borne out by the previous dealings between the parties and by custom of the trade. Only 100 boxes of the 3,000 covered by the contract were ever shipped. The plaintiff, however, attempts to maintain that a new arrangement was made between the parties whereby constructive delivery was made of the goods covered by the contract. Nevertheless, the plaintiff claims, as stated by its counsel, that it was entitled to recover commissions at the " rate fixed by the contract." The contract provides that commissions were payable " when goods are shipped." There is no allegation in the complaint or elsewhere, either that shipment was made or that there was any other arrangement substituted therefor, or to take the place of shipment. The undoubted construction of the contract is that commissions were not to be paid until the goods were shipped. (*Bliven* v. *Lighthouse*, 231 N. Y. 64.) In the *Bliven* case the action was to recover $1,000 commissions, which under the terms of the contract were to be paid " as soon as the sale is made and the money is delivered into the hands of J. C. Lighthouse." A broker secured purchasers who paid $1,000 down and agreed to pay $2,000 later. The plaintiff sued for the entire commissions, although only $1,000 had been paid. The Court of Appeals said (at p. 66): " He was content in the first place to agree that he should not be paid until the full amount of the purchase money was delivered to Lighthouse. His right to recover was dependent upon the payment of $3,000. That was the result clearly indicated and no waiver or modification of the contract in this regard was shown. As Andrews, J., said in *Colvin* v. *Post Mortgage & Land Co.* (225 N. Y. 510, 517): ' No collections, no commissions has a fair business appeal to both seller and broker.' No suggestion appears on the record that Bliven assumed or had a right to assume that under the contract of sale he was to take the first $1,000 paid, and every dollar as yet paid to his employer, as his compensation for securing a purchaser not for cash down but on time. He was to be paid $1,000 out of $3,000 cash when received; otherwise he was to receive nothing on the contract plaintiff has sued upon.

" The plaintiff failed to make out a cause of action and defendants' motion for a non-suit should have been granted." (See, also, *Larson* v. *Burroughs*, 131 App. Div. 877, in which the Second Department said: " It does not appear either that the balance of the cash amount was ever paid or that any deed was ever delivered;

on the contrary, it appears that the proposed vendor forfeited the payment made on account of the contract by the proposed vendee. Before the plaintiff could recover he must show either that the contract was carried out as indicated, or that non-performance was the fault of the defendant.")

The appellant contends and cites cases to uphold its position that the general rule is that in the absence of any stipulation to the contrary a broker earns his commissions upon the making of a binding contract of sale. The difficulty with the appellant's position is that the contract in suit expressly provided that such commissions were only to be credited upon shipment of the goods.

In answer to appellant's contention that its commissions were earned by reason of the subsequent arrangement made whereby a constructive delivery of the goods was made to Mogensen by placing of the goods in storage in Chicago, it clearly appears that none of said goods were placed in storage for Mogensen, but all of them were stored by and in the name of the defendant and were to be released only by Mogensen's eventual taking of the goods. All of the warehouse receipts were taken out in the name of the defendant Mogensen, at the suggestion of the plaintiff, to pay margins for such accommodations and storage charges, and shipment of the goods to be deferred until a later date.

The law is well settled that parties to a contract are deemed to have incorporated known usages by implication into their agreement. (*Schipper* v. *Milton*, 51 App. Div. 522.) There was no shipment of the goods in suit, with the exception of the two carloads, and I think no equivalent of such shipment was established by the plaintiff. The plaintiff itself requested and secured an extension of time for the shipment of the goods and procured their storage in contemplation of the eventual shipment. This appears clearly from the testimony as to the transaction between Peterman, plaintiff's vice-president and treasurer, and Finn, the agent of the defendant. It was Peterman who requested that the goods be placed in cold storage, and that suggestion was followed upon Mogensen's agreement to pay the expenses for the same. Peterman dictated the letter addressed to himself or his firm and purporting to come from the defendant. The whole thing and arrangement was for the accommodation of Mogensen, the purchaser. Never was any part of these goods, with the small exception, delivered to Mogensen, and on his eventual bankruptcy he defaulted to the damage of the defendant in over $200,000. No title to the goods ever passed to Mogensen. The turning over of the warehouse receipts for the 850 boxes as collateral security

to the bank was only to enable Mogensen to obtain the loan. Mogensen never had possession of said receipts, nor were they ever in his name.

It is finally the claim of the appellant that it is entitled to commissions on $292,965.32, said amount being made up of the cash margin of $25,000 paid by Mogensen, of the proceeds on the $92,000 note, and of $16,676.11 representing the purchase price of the two cars of pork actually shipped by the defendant. I think there is no force in the appellant's position in this respect. The defendant lost over $200,000 in the whole transaction. None of the payments upon which the plaintiff asks commissions were procured by the plaintiff. If plaintiff's argument were sound, then if Mogensen had abandoned his contract at the end of July, 1919, and the defendant had been forced to sell the entire 3,000 boxes of meat at a loss, plaintiff would have been entitled to commissions, not on the contract price of the meat, but on the amount realized at the sale. Such a proposition seems quite absurd.

I think the trial court properly directed a verdict for the defendant, and that the judgment entered thereon and the order denying the motion of the plaintiff to set aside said verdict should be affirmed, with costs.

CLARKE, P. J., DOWLING, McAVOY and BURR, JJ., concur.

Judgment and order affirmed, with costs.